UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

KEYSHA CASIANO,

                                                                                                     DECISION AND ORDER

                            Plaintiff,

                                                                                                     16-CV-6651L

              v.

RAELLE ASHLEY, et al.,

                            Defendants.
_____

Plaintiff Keysha Casiano brings this action against five individual defendants and the County of Monroe (New York), asserting claims under 42 U.S.C. § 1983 and New York law. Defendants have moved for summary judgment dismissing the complaint.

**FACTUAL BACKGROUND**[1]

On October 14, 2015, plaintiff called 911 after getting into an argument with her mother's boyfriend. Rochester Police Department officers responded to the scene and arrested plaintiff for second degree harassment. The boyfriend was also arrested. The officers took plaintiff into custody and drove her to the Monroe County Jail ("Jail").[2]

---

[1] The facts recited herein are taken from the parties' statements of facts (Dkt. #17-23, #21-9) and accompanying exhibits, and are undisputed, unless otherwise noted.

[2] Plaintiff does not dispute the lawfulness of her arrest. *See* Pl. Mem. (Dkt. #21-20) at 14.

Defendants Raelle Ashley, Danielle Cammilleri, Paul Maccarone, and Timothy Schliff (collectively "Deputies"), all of whom were deputies with the Monroe County Sheriff's Department ("MCSD"), were on duty at the Jail that day, assigned to Central Booking. Their job responsibilities included conducting searches of inmates entering the Jail in order to detect and confiscate contraband (such as weapons or drugs), prevent escapes and disturbances, and recover missing or stolen property. Ashley and Cammilleri are women; Maccarone and Schliff are men.

When plaintiff came in, she was photographed, searched, and put through a scan machine.[3] She removed her shoes and jacket to be scanned, but remained in her shirt, pants and undergarments.

Plaintiff was then pat-searched by Deputy Ashley. Defendants contend that during the pat search, plaintiff began acting suspiciously, repeatedly placing her hands down the front of her pants, as if grabbing for something. Plaintiff denies that she did so.

Following the pat search (which did not indicate the presence of any contraband), plaintiff was ordered to take a seat on the BOSS (Body Orifice Scanning System) chair, a non-intrusive scanning system. According to defendants, this displayed a positive reading, indicating that there might have been something concealed in plaintiff's clothing.

Plaintiff was then ordered to submit to a strip search. Under MCSD policies, such a search requires that the person to be searched completely disrobe, while each item of her clothing is searched and her entire body is visually inspected, including the inside of the mouth and ears only. *See* General Order 28-11 (Dkt. #17-13) at 1.

---

[3] The "scan machine" is apparently a metal detector or something similar. Plaintiff's walk-through of the scan machine is not at issue here.

In preparation for the search, plaintiff was taken to a separate room ("Strip Search Room"), where she was ordered to remove her clothing. Defendants contend that plaintiff refused to obey the deputies' commands to take off her clothes, and continued to put her hands down the front of her pants.

Defendants state that eventually they ordered plaintiff to put both hands behind her back, which she did long enough for defendant Ashley to get a handcuff on plaintiff's right wrist, at which point plaintiff began physically resisting. Plaintiff was then "wall stabilized" and then "ground stabilized" until the deputies were able to "gain compliance," finish handcuffing her, get her to her feet and take her to a cell.

Plaintiff agrees that she refused the deputies' order to disrobe, but she alleges that she told them that she could not, because she was menstruating. When she tried to show the deputies what she was talking about, by lowering her pants, Ashley and Cammilleri grabbed her, and together with another deputy, pushed her against a wall and threw her onto the floor. Plaintiff alleges that during this altercation, she was pepper sprayed and verbally abused.

After plaintiff was handcuffed, she was taken to a jail cell, where she was strip-searched by Ashley and Cammilleri. Plaintiff alleges that in doing so, defendants "broke" her clothes, and left her lying on the floor while male deputies watched from the hallway, laughing at her. Plaintiff alleges that at one point, after her clothes were removed, one of the male deputies said, "She is having her period."

Following the search (which turned up nothing), plaintiff spent the night in the Jail, and appeared in court the next morning for her arraignment. Her claims do not involve any events that occurred following those described above.

Defendants agree that a strip search was performed, but they deny any wrongdoing on their part. Defendants admit that there was some physical interaction between the Deputies and plaintiff, and they state that shortly after the strip search, plaintiff was examined by a nurse, and was noted to have some bruising and swelling.

Defendants have submitted a DVD containing several video recordings of these events taken by Jail security cameras. One video shows Ashley and Cammilleri standing outside the doorway of the Strip Search Room for several minutes. They are seen talking to someone inside the room, presumably plaintiff, who is off camera. There is no audio on the recording.

At one point, Ashley and Cammilleri enter the room, and emerge with plaintiff, with whom they are struggling. A male deputy, who had been in an adjacent hallway, comes in, and the three deputies wrestle plaintiff to the floor, face down, handcuff her behind her back, get her to her feet, and escort her down the hallway. During this incident, another male deputy enters the room, but by the time he gets there, the situation is under control, and he does not actively participate in subduing plaintiff. Based on the incident reports submitted by the deputies afterwards, it appears that Maccarone was the first male deputy to enter, and that Schliff was the second.

After that, plaintiff was taken to a cell and searched. The DVD submitted by defendants contains a recording of the hallway leading to the cell where plaintiff was taken, but all it shows is the two male deputies standing in the hallway and occasionally looking into the cell. Whatever was happening inside the cell is not visible.

Plaintiff filed the complaint in this action on September 27, 2016. She has sued Ashley, Cammilleri, Maccarone, Schliff, Monroe County Sheriff Patrick O'Flynn, and the County of

Monroe ("County").  Plaintiff has asserted five causes of action:  (1) a § 1983 claim against the Deputies and the County, alleging use of excessive force, in violation of plaintiff's rights under the Fourth Amendment; (2) a § 1983 claim against the County, essentially based on so-called *Monell* liability; (3) battery and (4) assault claims against the Deputies and the County; and (5) a negligence claim against all the defendants.

Defendants have moved for summary judgment on all claims.  In her response, plaintiff concedes that the fifth (negligence) claim should be dismissed in its entirety, that the first (excessive force) claim should be dismissed as to the County, and that the second (*Monell*) claim should be dismissed.  Plaintiff's response does not even mention Sheriff O'Flynn, and since it appears from the complaint that he is only included in the fifth cause of action, plaintiff implicitly concedes that there are no viable claims against O'Flynn.  Thus, the only claims that are now before the Court are the excessive force claim against the Deputies, and the assault and battery claims against the Deputies and the County.

## DISCUSSION

**I. Excessive Force**

Plaintiff's action is brought pursuant to 42 U.S.C. § 1983.  That statute "itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere."  *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816 (1985)).

In this action, plaintiff alleges that defendants violated her constitutional rights by using excessive force against her at the Jail. The parties do not dispute that as an arrestee at the time of the relevant events, plaintiff was constitutionally protected from the use of excessive force by the Fourth Amendment.

The Court must nonetheless make its own independent determination of the correct legal standard. Most cases addressing § 1983 claims of excessive force involve either the use of force during an arrest, which is governed by the Fourth Amendment, or the use of force against a prisoner, which is governed by the Eighth Amendment. The standards applied to those two types of claims are significantly different from each other. In particular, a plaintiff asserting an Eighth Amendment claim must show that the defendant acted with a subjectively wrongful state of mind. *See Sims v. Artuz*, 230 F.3d 14, 20-21 (2d Cir. 2000).

In the case at bar, plaintiff's claims arise out of events that occurred after she was arrested, but before she was arraigned. Such claims most appropriately fit within the protections of the Due Process Clause of the Fourteenth Amendment. *See Szabo v. Parascandolo*, No. 16-CV-3683, 2019 WL 481925, at *5 (E.D.N.Y. Feb. 7, 2019) ("For post-arrest, pre-trial detainees, ... the right 'to be free from excessive force amounting to punishment is protected by the Due Process Clause of the Fourteenth Amendment'") (quoting *United States v. Walsh*, 194 F.3d 37, 47 (2d Cir. 1999)).

The standards applicable to such a claim are largely the same as those applied to Fourth Amendment claims. Both relate to the objective reasonableness of the defendants' use of force; there is no "subjective" element, as with Eighth Amendment claims. *See Kingsley v.*

*Hendrickson*, 576 U.S. 389, 397 (2015) ("the appropriate standard for a pretrial detainee's excessive force claim is solely an objective one").

The distinction is also worth noting because many Fourth Amendment decisions relating to the use of force during an arrest turn on factors that have little relevance in the context of force used against a person who has already been taken into custody, such as the severity of the crime that led to the arrest, the risk of the suspect's flight to avoid arrest, and the danger that the suspect posed to members of the public. *See*, *e.g.*, *Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010). More pertinent factors in the context of a post-arrest claim under the Fourteenth Amendment are "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 576 U.S. at 397.

To say that the force used must have been reasonable, however, does not mean that it must not have exceeded in the slightest that which might seem absolutely necessary, with the benefit of hindsight. As the Supreme Court has stated, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Graham v. Connor*, 490 U.S. 386, 396 (1989) (internal quote omitted). To be actionable, the force used must be both unreasonable in light of the surrounding circumstances, and "more than *de minimis*." *Antic v. New York City*, 273 F.Supp.3d 445, 458 (S.D.N.Y. 2017) (citing *Romano v. Howarth*, 998 F.2d 101, 105 (2d. Cir. 1993)), *aff'd*, 740 Fed.Appx. 203 (2d Cir. 2018). "Injuries held to be *de minimis* for purposes of defeating excessive force claims include short-term pain, swelling, and bruising, brief numbness from tight handcuffing, claims of minor

discomfort from tight handcuffing, and two superficial scratches with a cut inside the mouth." *Lemmo v. McKoy*, No. 08-CV-4264, 2011 WL 843974, *5 (E.D.N.Y. Mar. 8, 2011) (internal citations omitted).

The Court has watched the video recordings submitted by defendants. Although plaintiff is not visible in some portions of some of the recordings, the incident that directly gives rise to her claim–the altercation outside the Strip-Search Room–is entirely captured on video.

Having watched that recording, I find as a matter of law that no reasonable jury could conclude that the force used by defendants was excessive. Defendants are therefore entitled to summary judgment.

First, while the two sides' accounts differ in some minor details, it is clear that the deputies brought plaintiff out of the Strip Search Room because she refused to remove her clothing, her pants in particular. Though plaintiff alleges that she did not want to take off her underwear because she was having her menstrual period, she testified both at her deposition and at her 50-h hearing[4] that she did not remove *any* of her clothing and that she told the deputies that she refused to undress, and the video shows that she was fully dressed when she was removed from the Strip Search Room. Plaintiff testified at her 50-h hearing, "they [the deputies] say take my clothes out. [sic] Why? No." Dkt. #21-1 at 16.

Given plaintiff's steadfast refusal to comply with the deputies' directives, it was objectively reasonable for them to enter the room and to use some force to get her to comply with their commands. *See Berman v. Williams*, No. 17cv2757, 2019 WL 4450810, at *6 (S.D.N.Y.

---

[4] A 50-h hearing is a hearing conducted pursuant to N.Y. Gen. Mun. L. § 50-h in claims against a municipality, concerning injuries or damages alleged to have been sustained by the claimant.

Sept. 17, 2019) ("The defendants' use of force during the Intake Search Area incident was objectively reasonable because it was proportionate to the plaintiff's resistance. The plaintiff refused to comply with orders to remove his clothing in the Intake Search Area, which was a legitimate command").

Having viewed the video of what happened when plaintiff was removed from the Strip Search Room, I find as a matter of law that the force employed was reasonable. The deputies did not strike her; they grappled with her and wrestled her to the ground.

It is undisputed that plaintiff was pepper-sprayed. At her deposition, defendant Ashley stated that she "delivered a short burst of [pepper spray] to [plaintiff's] face," because plaintiff "was still refusing" to comply with the order to put both hands behind her back. Ashley Depo. Tr. (Dkt. #17-19) at 40.

"The use of pepper spray is not an actionable constitutional violation where there is no lasting injury, and where the subject was not cooperating with law enforcement." *Walton v. Lee*, No. 15 CIV. 3080, 2019 WL 1437912, at *6 (S.D.N.Y. Mar. 29, 2019); *accord Williams v. City of New York*, No. 05 Civ. 10230, 2007 WL 2214390, at *12 (S.D.N.Y. July 26, 2007) (use of mace was "not actionable" as excessive force where the arrestee "suffered only the expected side effects: temporary discomfort and disorientation").

In the case at bar, plaintiff received one burst of pepper spray, and there is no evidence that she suffered any lasting or serious effects. The record shows that plaintiff was subdued relatively quickly and without resort to punches, kicks, or other forceful blows that might have inflicted greater injury. If anything, the use of pepper spray was appropriate and effective.

My finding that the Deputies did not use excessive force renders it unnecessary for the Court to address defendants' qualified immunity defense, but I do find as a matter of law that they are entitled to qualified immunity. The doctrine of qualified immunity "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). A defendant is entitled to summary judgment on qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Robinson v. Via*, 821 F.2d 913, 921 (2d Cir. 1987). *See*, *e.g.*, *Dobson v. Doughtery*, No. 17-CV-1014, 2020 WL 8167269, at *12 (W.D.N.Y. Sept. 23, 2020), *Report and Recommendation adopted*, 2021 WL 131030 (W.D.N.Y. Jan. 14, 2021).

As stated, I find as a matter of law that no reasonable jury could conclude that the force used by the Deputies was excessive. *Ipso facto*, it could not have been objectively unreasonable for the Deputies to believe that their actions were lawful.

I am also unpersuaded by plaintiff's argument that qualified immunity cannot apply here because the Deputies were not performing a discretionary act when the underlying incidents occurred. While the "booking" process may include some ministerial aspects, such as filling out paperwork, in this case it was not the routine processing of plaintiff that gives rise to her claims. Rather, it was the Deputies' decision to use force and how much force to use against plaintiff, which clearly involved the exercise of discretion. *See Aldini v. Johnson*, 609 F.3d 858, 867-68 (6th Cir. 2010) (remanding district court's summary judgment decision because lower court

applied incorrect legal standard, but finding no error in district court's consideration of whether defendant officers were entitled to qualified immunity on claim that they used excessive force against plaintiff during his booking); *Ellis v. City of Elmira*, No. 14-CV-6666, 2018 WL 6047070, at *6 (W.D.N.Y. Nov. 19, 2018) (finding that force used by officer was objectively reasonable and in the alternative that officer was entitled to qualified immunity).

I also reject plaintiff's contention that there are unresolved issues of fact that preclude the entry of summary judgment on qualified immunity grounds. The "issues" identified by plaintiff, such as whether the Deputies should have performed another BOSS scan, do not relate at all to genuine issues of fact, but to the reasonableness of the Deputies' actions. *What* they did is clear; plaintiff's claims center on *whether* they should have done it, and viewing the record objectively, the Court finds no constitutional violation.

**II. Assault and Battery Claims**

Having dismissed plaintiff's claims under federal law, the Court need not reach his state law claims. *See N.Y. Mercantile Exch., Inc. v. Intercontinental Exchange, Inc.*, 497 F.3d 109, 119 (2d Cir. 2007) ("In general, where the federal claims are dismissed before trial, the state claims should be dismissed as well") (internal quotation marks omitted).

But that is a general rule, not an absolute one. The statute governing federal courts' supplemental jurisdiction over state law claims, 28 U.S.C. § 1367, "permits the district court to weigh and balance several factors, including considerations of judicial economy, convenience, and fairness to litigants." *Purgess v. Sharrock*, 33 F.3d 134, 138 (2d Cir. 1994). *See*, *e.g.*, *Hendrix v. Pactiv LLC*, __ F.Supp.3d __, 2020 WL 5634329, at *8 (W.D.N.Y. Sept. 21, 2020)

("While my dismissal of plaintiff's claims based on federal law renders it unnecessary for the Court to reach his claims under state law, in the interests of judicial economy I do so, since the law is abundantly clear that the state law claims must be dismissed as well").

Because plaintiff's federal and state claims are so closely intertwined, both legally and factually, in my discretion I grant defendants' motion for summary judgment as to her claims of assault and battery.

"Assault and battery claims under New York law and Fourth Amendment excessive force claims are evaluated pursuant to the same standard." *Feaster v. City of Middletown*, 16-cv-734, 2016 WL 10570984, at *3 (S.D.N.Y. Nov. 28, 2016) (quoting *Cosby v. City of White Plains*, 04-cv-5829, 2007 WL 853203, at *6 (S.D.N.Y. Feb. 9, 2007)). *See also Humphrey v. Landers*, 344 Fed.Appx. 686, 688 (2d Cir. 2009) ("except for § 1983's requirement that the tort be committed under color of state law, the essential elements of [excessive force and state law assault and battery claims are] substantially identical") (quoting *Posr v. Doherty*, 944 F.2d 91, 94-95 (2d Cir. 1991)) (internal quotation marks and brackets omitted).

The only substantive difference between plaintiff's excessive force claims and her assault and battery claims is that the latter are brought not just against the Deputies but against the County as well, under the doctrine of *respondeat superior*. But the law is clear that the County cannot be held liable on that basis.

First, "*[r]espondeat superior* is not an independent cause of action, but a theory that must attach to an underlying claim." *Alexander v. Westbury Union Free Sch. Dist.*, 829 F.Supp.2d 89, 112 (E.D.N.Y. 2011). For the reasons stated above, there is no viable claim here to which the County's liability could attach.

Second, New York law is clear that "counties are generally not liable for tortious acts other than negligence committed by a Sheriff or his or her deputies without a legislative assumption of liability."  *Nolan v. County of Erie*, No. 19-cv-1245, 2021 WL 51004, at *7 (W.D.N.Y. Jan. 6, 2021).  *See*, *e.g.*, *Miller v. County of Monroe*, 2013 WL 2180738, at *5 (W.D.N.Y. May 17, 2013) (dismissing tort claims because "the County does not have *respondeat superior* liability for the conduct of the [Sheriff's] Deputies").[5]  Plaintiff's claim against the County must be dismissed for that reason as well.

## CONCLUSION

Defendants' motion for summary judgment (Dkt. #17) is granted, and the complaint is dismissed.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
January 28, 2021.

---

[5] Although this case plainly does not involve alleged negligence, I also note that under New York law, a county "may not be held responsible for the negligent acts of the Sheriff and his deputies on the theory of *respondeat superior*, in the absence of a local law assuming such responsibility."  *Villar v. County of Erie*, 126 A.D.3d 1295 (4th Dep't 2015) (internal quotation marks omitted).  Plaintiff has cited no local law indicating that the County has assumed such responsibility.